AB:KCB

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

– – – – – – – – – – – – – – – – – – –X

UNITED STATES OF AMERICA

      - against -

VITALII ANTONENKO,

           Defendant.

– – – – – – – – – – – – – – – – – – –X

AFFIDAVIT IN SUPPORT OF
REMOVAL TO THE
<u>DISTRICT OF MASSACHUSETTS</u>

(Fed. R. Crim. P. 5)

Case No. 19-MJ-196

EASTERN DISTRICT OF NEW YORK, SS:

           VITO ASARO, being duly sworn, deposes and states that he is a Special

Agent with the United States Secret Service (the "USSS"), duly appointed according to law

and acting as such.

           On or about February 26, 2019, an arrest warrant was issued by the United

States District Court for the District of Massachusetts commanding the arrest of the

defendant VITALII ANTONENKO, in connection with a complaint charging the defendant

with money laundering conspiracy, in violation of Title 18, United States Code, Section

1956(h).

           The source of your deponent's information and the grounds for his belief are

as follows:[1]

---

      [1]     Because the purpose of this affidavit is to set forth only those facts necessary
to establish probable cause for removal, I have not described all of the relevant facts and
circumstances of which I am aware.

1.      On or about February 26, 2019, an arrest warrant was issued by the United States District Court for the District of Massachusetts commanding the arrest of the defendant VITALII ANTONENKO (the "Arrest Warrant"), in connection with a complaint charging the defendant with money laundering conspiracy, contrary to Title 18, United States Code, Section 1956(h) (the "Complaint").  A copy of the Arrest Warrant and Complaint are attached hereto as Exhibit A.

2.      On March 2, 2019, I arrested the defendant VITALII ANTONENKO, pursuant to the Arrest Warrant, at John F. Kennedy International Airport in Queens, New York.  Upon his arrest, the defendant possessed a United States passport, an expired Ukrainian passport and a New York State driver's license.  The Ukrainian passport and the New York State driver's license both bore the defendant's name, "Vitalii Antonenko."  The United States passport bore the name, "Vital Antonenko."  All three documents listed the same date of birth as the date of birth of the individual wanted in the District of Massachusetts.

3.      The defendant VITALII ANTONENKO also acknowledged that his name is "Vitalii Antonenko."  I have reviewed a photograph of the "Vitalii Antonenko" wanted in the District of Massachusetts and compared it to the defendant VITALII ANTONENKO.  Based on my comparison, I believe the photograph to depict the defendant.  Further, based on my comparison, I believe the photograph to depict the same individual as pictured in the photographs on the United States passport, the Ukrainian passport and the New York State driver's license.

4.      Based on the foregoing, I believe that the defendant is the individual wanted in the District of Massachusetts.

2

WHEREFORE, your deponent respectfully requests that the defendant

VITALII ANTONENKO be removed to the United States District Court for the District of

Massachusetts so that he may be dealt with according to law.

VITO ASARO
Special Agent
United States Secret Service

Sworn to before me this
4th day of March, 2019

/s/ James Orenstein

THE HONORABLE JAMES ORENSTEIN
UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF NEW YORK

<u>EXHIBIT A</u>

AO 442 (Rev. 11/11) Arrest Warrant

# UNITED STATES DISTRICT COURT

for the

District of Massachusetts

| | | |
|---|---|---|
| United States of America | ) | |
| v. | ) | Case No.   19-MJ-4153 (DHH) |
| Vitalii Antonenko | ) | |
| | ) | |
| | ) | |
| | ) | |
| _____ | ) | |
| *Defendant* | | |

## ARREST WARRANT

To:     Any authorized law enforcement officer

**YOU ARE COMMANDED** to arrest and bring before a United States magistrate judge without unnecessary delay
*(name of person to be arrested)* _____ ,
who is accused of an offense or violation based on the following document filed with the court:

☐ Indictment     ☐ Superseding Indictment     ☐ Information     ☐ Superseding Information     ☑ Complaint
☐ Probation Violation Petition     ☐ Supervised Release Violation Petition     ☐ Violation Notice     ☐ Order of the Court

This offense is briefly described as follows:

   18 U.S.C. § 1956(h) (money laundering conspiracy)


Date:   02/26/2019                                        *Issuing officer's signature*

City and state:   Boston, Massachusetts            Hon. David H. Hennessy, Chief U.S. Magistrate Judge
                                                                         *Printed name and title*

| Return |
|---|
| This warrant was received on *(date)* _____ , and the person was arrested on *(date)* _____ at *(city and state)* _____ . |
| Date: _____                           _____ |
|                                                                  *Arresting officer's signature* |
|                                                                  _____ |
|                                                                  *Printed name and title* |

AO 442  (Rev. 11/11)  Arrest Warrant (Page 2)

**This second page contains personal identifiers provided for law-enforcement use only
and therefore should not be filed in court with the executed warrant unless under seal.**

*(Not for Public Disclosure)*

Name of defendant/offender:   Vitalii Antonenko

Known aliases:   "Vitali," "Vital," "Sabe"

Last known residence:   601 W. 41st Street, Apt. 10J, New York, NY 10036-1952

Prior addresses to which defendant/offender may still have ties:   2848 Brighton 7th Street, Brooklyn, NY 11235-5272

Last known employment:   N/A

Last known telephone numbers:   646-421-7112

Place of birth:   Ukraine

Date of birth:   11/17/1991

Social Security number:   ███████

Height:   6' 2"                    Weight:   165

Sex:   M                          Race:   White

Hair:   Brown                     Eyes:   Brown

Scars, tattoos, other distinguishing marks:   Cirlce of Life, Circles (Arm)

History of violence, weapons, drug use:   July 20, 2017 arrest in New York City (possession of methamphetamine, crack
cocaine, marijuana); November 2, 2017 (domestic assault - metal stick/verbal threaets)

Known family, friends, and other associates *(name, relation, address, phone number)*:   Liana Antonenko, mother,
601 W. 41st Street, Apt. 10J, New York, NY 10036

FBI number:   11815919Q (New York State), 02198488Q (New York State)

Complete description of auto:

Investigative agency and address:   USSS Special Agent Peter Gannon - (617) 913-4428

Name and telephone numbers (office and cell) of pretrial services or probation officer *(if applicable)*:
N/A

Date of last contact with pretrial services or probation officer *(if applicable)*:
N/A

AO 91 (Rev. 11/11)  Criminal Complaint

# UNITED STATES DISTRICT COURT
### for the
### District of Massachusetts

| | | |
|---|---|---|
| United States of America | ) | |
| v. | ) | Case No. |
| Vitalii Antonenko | ) | 19-MJ-4153 (DHH) |
| | ) | |
| | ) | |
| | ) | |
| *Defendant(s)* | | |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of ___March 2014 through January 2016___ in the county of ___Middlesex___ in the ___ District of ___Massachusetts___ , the defendant(s) violated:

| *Code Section* | *Offense Description* |
|---|---|
| 18 USC 1956(h) | (money laundering conspiracy) |

This criminal complaint is based on these facts:

SEE ATTACHED AFFIDAVIT OF SENIOR SPECIAL AGENT PETER GANNON

☑ Continued on the attached sheet.

*Complainant's signature*

Special Agent Peter Gannon, U.S. Secret Service
*Printed name and title*

Sworn to before me and signed in my presence.

Date: ___02/26/2019___

*Judge's signature*

City and state: ___Boston, Massachusetts___

Hon. David H. Hennessy, U.S.M.J.
*Printed name and title*

## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

I, Peter Gannon, being duly sworn, state as follows:

1.      I am a Senior Special Agent with the United States Secret Service ("USSS") and have been so employed since 1995. I received formal training at the Federal Law Enforcement Training Center ("FLETC") in Glynco, Georgia and at the USSS Academy in Beltsville, Maryland. I am currently assigned to the FBI's Joint Terrorism Task Force. My prior assignments, however, have included investigating violations of Title 18, United States Code, Sections 371 (conspiracy), 1028 (identity theft), 1028A (aggravated identity theft), 1029 (access device fraud), 1030 (computer fraud and abuse), 1341 (mail fraud), 1343 (wire fraud), 1344 (bank fraud) and 1956 (money laundering) on the Internet. Based on my training and experience, I am familiar with the means by which individuals use computers and information networks to commit these and other crimes.

2.      I submit this affidavit in support of an application for a criminal complaint charging Vitalii Antonenko, with money laundering conspiracy, contrary to Title 18, United States Code, Section 1956(a)(1)(B) and in violation of Title 18, United States Code, Section 1956(h).

3.      This affidavit is based on my personal participation in the investigation, as well as on information provided to me by law enforcement agents assisting in this investigation as described herein. This affidavit is being submitted for the limited purpose of establishing probable cause to secure a criminal complaint and arrest warrant. It does not set forth all the information gathered during this investigation.

## Overview

4.    At all times relevant to this affidavit:

a.    Antonenko resided in New York City. Born in Ukraine, Antonenko became a naturalized U.S. citizen on August 1, 2014, during the course of the events described below. Antonenko controlled the e-mail account antvital@gmail.com.

b.    Person 1 resided in or near Los Angeles, California, where Person 1 ran an unlicensed business that exchanged Bitcoin, a digital currency, for cash, and cash for Bitcoin.

c.    Person 2 was an associate of Antonenko, who resided in New York City. Beginning in May 2015, Person 2 held a Bank of America checking account numbered xxxx-xxxx-7462. In connection with opening that account, Person 2 claimed to be unemployed.

5.    Based on the investigation to date, and for the reasons set forth below, there is probable cause to believe that between at least March 2014 and approximately January 2016, Antonenko: (1) received Bitcoin constituting criminal proceeds from the online sale of stolen payment card data and personally identifiable information ("PII"); and (2) agreed to engage, and engaged, in Bitcoin-for-cash transactions with Person 1, Person 2, and others, intending both to conceal and disguise the nature and source of those criminal proceeds and to avoid federal transaction reporting requirements.

## The Statutes

6.    Title 18, United States Code, Section 1956(a)(1)(B) provides, in pertinent part:

(a)(1)  Whoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts ... such a financial transaction which in fact involves the proceeds of specified unlawful activity— ...

    (B)    knowing that the transaction is designed in whole or in part—
        (i)    to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity; or
        (ii)    to avoid a transaction reporting requirement

shall be sentenced to a fine of not more than $500,000 or twice the value of the property involved in the transaction, whichever is greater, or imprisonment for not more than twenty years or both.

7.     Title 18, United States Code, Section 1956(h) provides, in pertinent part that "any person who conspires to commit any offense defined in this section ... shall be subject to the same peanlties as those prescribed for the offense of the commission of which was the object of the conspiracy."

## Investigation into "Website A"

8.     The USSS is currently investigating one or more individuals (whose identities are unknown) for stealing and selling payment cards and the PII of U.S. citizens, to include names, dates of birth, and Social Security Numbers, all in violation of 18 U.S.C. §§ 1028 (identity fraud), 1028A (aggravated identity theft), 1029 (access device fraud), 1030 (computer fraud and abuse), and 1343 (wire fraud), as well as conspiracies to commit these offenses under 18 U.S.C. §§ 371 and/or 1349 (collectively "the Target Offenses").

9.     The unknown subjects offer the stolen payment card and PII data for sale on several black market "carding" websites, including, since at least as early as 2012, on Website A.

10.     Since June 2015, law enforcement personnel acting in an undercover capacity from inside Massachusetts ("UC") have purchased approximately 450 individuals' PII or payment card information from Website A.

11.     Specifically,

a.     On June 1, 2015, UC purchased the PII and payment card data of an accountholder from California for approximately $15 in Bitcoin.

3

b.     On January 20, 2016, UC purchased PII and payment card data for 46 American Express and 207 Mastercard accountholders for approximately $1,550 in Bitcoin.

c.     On December 2, 2016, UC purchased PII and payment card data for 50 American Express accountholders from Massachusetts for approximately $200 in Bitcoin.

d.     On June 2, 2017, UC purchased PII and payment card data for 50 American Express accountholders from Massachusetts for approximately $200 in Bitcoin.

e.     On July 31, 2017, UC purchased PII and payment card data for 50 American Express accountholders from Massachusetts for approximately $240 in Bitcoin.

f.     On September 25, 2017, UC purchased PII and payment card data for 50 American Express accountholders from Massachusetts for approximately $225 in Bitcoin.

12.     Based on my training and experience investigating online crimes and the fact there is no lawful way to sell third parties' PII and payment card information, the operators of Website A did not have authorization to distribute these victims' PII or payment card information.

13.     There is accordingly probable cause to believe that Website A operates in furtherance of the Target Offenses, each of which is "specified unlawful activity" within the meaning of 18 U.S.C. § 1956(a)(1). *See* 18 U.S.C. § 1956(c)(7).

## Tracing the Proceeds of UC's Transactions at Website A

14.    According to the blockchain—a public register of all transactions conducted in Bitcoin—Website A accepted UC's June 2015 undercover payment at Bitcoin address 1Bheq4MispbRQu3ZBkmVKsA7Nth4yVYU4F ("the 1Bheq Address").

15.    Analysis of the 1Bheq Address and other Bitcoin transactions in the blockchain reveals that the 1Bheq Address is part of a cluster of addresses (sometimes referred to as a Bitcoin "wallet") that contains approximately 19,000 related Bitcoin addresses (collectively "Wallet A"). The 19,000 payment addresses in Wallet A share common features, including control of encryption keys, that make it likely the addresses in Wallet A are controlled by the same persons or persons.

16.    Analytical tools and discussions with other law enforcement officials with expertise in cybercrime reveal that Wallet A appears to contain one main group of addresses used by the operator of Website A to receive funds provided at signup for Website A accounts and to receive payment for purchases made at Website A, including the payment that UC made in June 2015.

17.    According to the blockchain, Wallet A, which was active between November 2013 and July 2017, engaged in more than 575,000 separate Bitcoin transactions.  Wallet A has both received and distributed approximately $23 million.

*Other Wallets Associated with the Operation of Website A*

18.    A significant percentage of the Bitcoin sent to Wallet A was forwarded to a second wallet ("Intermediary Wallet A").  More specifically, of the approximately 66,000 Bitcoin received by Wallet A since its creation, approximately 58,000 of that Bitcoin (almost 88 percent) went from Wallet A to Intermediary Wallet A.

19.    Notably, UC's next transactions—in December 2015, January 2016, June 2017, and September 2017— all went to Bitcoin addresses associated with another wallet described here as

5

Wallet B. Wallet B, active since June 2015, has been associated with more than 1.5 million known transactions totaling approximately $71,000,000.

20.     Wallet B, in turn, sent more than $20 million in the nine months between June 2015 and February 2016 to Intermediary Wallet A—the same wallet that received approximately 88 percent of the money sent to Wallet A.

21.     These additional Bitcoin transfers to Intermediary Wallet A provide additional cause to believe that moneys directed to Intermediary Wallet A are proceeds from the operation of Website A, which is operated in furtherance of the Target Offenses.

### Antonenko's Financial Links to Criminal Carding

#### Liberty Reserve

22.     On October 17, 2012, using the gmail account antvital[at]gmail.com, Antonenko registered an account in his name and November 1991 date of birth at Liberty Reserve.

23.     Before it was shuttered in May 2013 in connection with a criminal money laundering investigation brought by the U.S. Department of Justice and the U.S. Attorney's Office for the Southern District of New York, Liberty Reserve was one of the principal money transmitting services used by cybercriminals around the world to amass, distribute, store, and launder the proceeds of their illegal activity, including proceeds of investment fraud, credit card fraud, identify theft and computer hacking. As of May 2013, it had more than 5 million user accounts worldwide, including more than 600,000 accounts associated with users in the United States, and had processed millions of transactions. The site's founder admitted in his plea agreement to laundering more than $250 million in criminal proceeds.

24.     According to records obtained in connection with the Liberty Reserve investigation, between October 2012 and February 2013, Antonenko received approximately $15,539 in payments from a Liberty Reserve account in the name of ValidShop.

6

25.     At that time, ValidShop was an online criminal carding forum that sold stolen payment card data.  Based on my training and experience and the training and experience of other USSS investigators, I am aware that criminal carding forums generally make payments to suppliers of services or inventory (i.e., stolen payment cards), not to customers of such sites.  Additionally, there was no known legitimate business being conducted on ValidShop.

26.     Between October 2012 and May 2013, a different Liberty Reserve account in the name "ferum511mac" made approximately $51,651 in payments to Antonenko's Liberty Reserve account.

27.     At the time, "Ferum" was another known online criminal forum that sold stolen payment card data.

28.     Again, investigators are not aware of any lawful reason for Antonenko or anyone else to be receiving payment in these total amounts from Ferum.

### Bitcoin Payments to Antonenko

29.     In connection with its investigation of Antonenko, USSS investigators used the blockchain to analyze three Bitcoin wallets associated with Antonenko.

30.     Two of these wallets, numbered 12XtErsC78w3gzMZ7mYnsXub27FpQVTbDo ("the 12Xt Wallet") and 1NkfRyNvALWrwXPD2VZM8A34UvEoqWT78 ("the 1Nkf Wallet"), received transaction confirmations at Antonenko's e-mail address antvital[at]gmail.com.

31.     A third wallet associated with Antonenko, numbered 1GVF2dsMkCVUbJvFJdkJfFMXCtLtHEV7M ("the 1GVF Wallet"), received incoming Bitcoin transactions from both the 1NKfR and 12Xt Wallets and from Intermediary Wallet A, and sent Bitcoin both to Person 1 (as described below) and to an account at BTC-e—a registered Bitcoin exchange—in Antonenko's name.

32.     As set forth in the table below, these three wallets associated with Antonenko sent and received significant amounts of Bitcoin between September 2013 and May 2017:

| Wallet | Start Date | End Date | Amount[1] |
|--------|-----------|----------|-----------|
| 1GVF | September 2013 | March 2014 | $230,000 |
| 12Xt | November 2013 | January 2014 | $40,000 |
| 1Nkf | March 2014 | May 2017 | $465,000 |

33.     More than $140,000 of the amounts in the table above were transferred from either Wallet A or Intermediary Wallet A, the Bitcoin wallets described above that the investigation has associated with the operation of Website A and the Target Offenses.

34.     Antonenko had no identified source of income that would account for these large-dollar Bitcoin transfers to and from wallets that he controlled, or for substantial cash deposits into traditional bank accounts that he held during this period.

35.     According to records obtained from the Internal Revenue Service, for the tax years 2013 through 2016, inclusive, Antonenko was claimed as a dependent on a relative's tax return. That relative reported no more than $38,000 in total income in any of those years. Antonenko himself filed no tax returns during these tax years, and tax transcripts show no employers reporting W-2 or 1099 payments to Antonenko that would explain the Bitcoin-for-cash activities described below.

---

[1] These amounts approximate the total amount of Bitcoin flowing through each wallet. A dollar both sent and received from the same wallet would thus be reflected as $2, and if sent on to a second wallet, would be reflected in more than one row of this table.

36.     Moreover, and as set forth below, beginning in January 2014 and continuing through January 2016, Antonenko regularly and immediately transferred Bitcoin he received from Wallet A and Intermediary Wallet A to the Bitcoin exchanger identified here as Person 1.

37.     Person 1, in turn and in exchange for those Bitcoin, either gave Antonenko U.S. currency in person or deposited corresponding U.S. dollar amounts into bank accounts belonging to Antonenko and Person 2, among others.

38.     Person 1 was not a money transmitter registered with the Treasury Department and its Financial Crimes Enforcement Network ("FinCEN"), which issue regulations aimed at deterring money laundering by requiring legitimate money remitters to both register with FinCEN and to obtain and keep records regarding their customers' identities.  Operating a money transmitting business without following FinCEN's registration requirements violates Title 18, United States Code, Section 1960.

39.     Through my review of certain of Person 1's diary and financial ledgers—seized from Person 1 in connection with a separate criminal investigation in which she was ultimately charged[2]—I am aware that Person 1 purchased Bitcoin from Antonenko at a 9 to 10 percent discount below the prevailing market price for Bitcoin on Bitstamp, a currency exchange that is registered with FinCEN and does comply with its anti-money laundering regulations.

40.     For example, Person 1 wrote in a diary of his/her activities on January 14, 2014:

> I love that I've been buying from Vitali all week and he has more!  I love that it's been working out great.  I love selling for 5-10% above [B]itstamp and buying for 9% below and making $400 a day or more.

---

[2] Person 1 pleaded guilty in the United States District Court for the Central District of California to one count of operating an unlicensed money transmitting business and one count of money laundering in July 2018.  Person 1 was later sentenced to a term of imprisonment.

9

41.    On January 26, 2014, Person 1 wrote: "I love that I'm coming back to bitcoin trades. I love that I'm going to sell the shit out of these bitcoins that I lose money on and it's all going to be ok because I'll get cheap bitcoins from Vitali tomorrow."

42.    On July 9, 2014, Person 1 wrote "I love that Vitalii just sent me 2 coins! Woohoo! And I sent him money immediately. I love that he sends me coins and I have plenty of money in BofA so I can easily get him money."

43.    Person 1's financial ledger similarly indicates in a column labeled "% from Bstmp" that Person 1's transactions with Antonenko were priced at "-9.0%" to the prevailing Bitstamp price.

44.    Based on my training and experience as a financial investigator, and based on my conversations with investigators and analysts familiar with cryptocurrency markets, I am aware that a 9 percent discount below a publicly available sale price for Bitcoin is a standard rate for unlicensed money remitters, who in exchange for that discount are offering their customers the ability to avoid having to provide traceable identifying information that would be required in market rate transactions.

45.    Antonenko's consistent use of an unlicensed exchanger provides additional cause to believe that he is laundering Bitcoin proceeds that he received from the operators of Website A. (As noted above, there is probable cause to believe that moneys Antonenko received from the operators of criminal carding forums are proceeds of the Target Offenses). Based on my training and experience as a financial investigator, there is no legitimate reason for Antonenko to have sold Bitcoin at a below-market price to Person 1 unless he was attempting to conceal the unlawful source of the Bitcoin.

46.     The mechanism that Person 1 used to return the proceeds of these Bitcoin transactions to Antonenko—making structured cash and other deposits into the bank of accounts of Antonenko and Person 2—reinforces my belief that Antonenko and Person 1 are engaging in financial transactions involving the proceeds of the Target Offenses with the intent to conceal the source of the funds and avoid reporting requirements.

47.     Presented below are several examples of financial transactions that move serially from the Website A-linked Intermediary Wallet A, to one of Antonenko's Bitcoin wallets, to Person 1's Bitcoin wallet, to the bank accounts of Antonenko or Person 2.

48.     On March 30, 2014, at 7:37 p.m., Intermediary Wallet A sent Antonenko's 1Nkf Wallet 25 Bitcoin.  On April 1, 2014, in his next Bitcoin transaction from the same wallet, Antonenko forwarded 24.9999 Bitcoin to Person 1's wallet.

49.     Person 1's ledger for April 1, 2014 shows "24.9999" in "BTC", an "$11,033" entry under the name Vitalii and the notations "Citibank" and "-9.0%" from "Bstmp."  Based on my training and experience as a financial investigator and the investigation to date, I interpret the ledger to record a transaction in which Person 1 purchased 24.9999 Bitcoin from Antonenko for $11,033. Person 1 noted the purchase of the Bitcoin at a 9 percent discount from the prevailing price on the Bitstamp exchange.[3]

50.     Citibank records for a joint account in the names of Antonenko (numbered xxxxxx4370) and a relative show two cash deposits on consecutive days totaling exactly $11,033. The first deposit, on April 1, 2014—the same day Antonenko's wallet sent Bitcoin to Person 1's

---

[3]Based on the price that Person 1 recorded—nine percent below Bitstamp—I would expect that the amount of currency Antonenko received in exchange for his Bitcoin would be approximately 9 percent less than the value of the Bitcoin he sent to Person 1.  I attribute any variance from this amount to the fact that Bitcoin's market price fluctuates.

wallet—was for $9,900 at a Citibank branch in California, where Person 1 resides (and where Antonenko and his relative did not). A second deposit, on the next day (April 2, 2014), was for $1,133 at a different Los Angeles-area Citibank branch. As noted above, these two deposits in Citibank's records match Person 1's ledger exactly, which causes me to believe that Person 1 made or directed these two cash deposits.

51.     There are two features to these April 1 and April 2 deposits that cause me to believe that Antonenko and Person 1 were attempting to conceal the source of the funds for them. First, Person 1 deposited $9,900 into Antonenko's account on April 1, 2014. This amount is just $100 below the threshold that would require Citibank to generate a Currency Transaction Report ("CTR") to FinCEN for a cash transaction involving $10,000 or more. Based on my training and experience investigating financial frauds, engaging in cash transactions just below the CTR threshold is indicative of intent to evade the CTR requirement, which itself can be a violation of federal criminal law. *See* 31 U.S.C. § 5324.

52.     Second, Person 1 and Citibank's records indicate that Person 1 split the $11,033 payment to Antonenko across two days, again evidencing an intent to disguise the true (i.e., over $10,000 in cash) nature of Person 1's payment to Antonenko. That Person 1 directed these deposits at two different Los Angeles area Citibank branches only provides further indicia of an intent to disguise the true nature of the transaction from Citibank and from the investigators who rely on CTRs.

53.     In a second group of serial transactions, on April 11, 2014, Intermediary Wallet A sent 26.25 Bitcoin (valued at approximately $10,579.28) to Antonenko's 1Nkf Wallet. The same day, Antonenko forwarded 26.2 Bitcoin to Person 1's wallet. Person 1's payment ledger shows a payment that day to "Vitalii" totaling "$10,109" for "26.2" Bitcoin.

54.     Citibank's record of Antonenko's account shows two separate deposits that same day at different Los Angeles area branches: a $7,609 cash deposit at one Citibank branch and a $2,000 cash deposit at a second. These deposits total $9,609, exactly $500 less than the amount reflected in Person 1's ledger, and just below the $10,000 CTR threshold. Based on other instances described above of Person 1 making deposits that evidence an intent to skirt the CTR threshold, these April 11, 2014 transactions cause me to believe that Antonenko and Person 1 were attempting to avoid reporting requirements and conceal the origin of the funds Person 1 was depositing into Antonenko's Citibank account by keeping the deposit amount just below $10,000.

55.     On May 20, 2014, Person 1 and Antonenko engaged in another series of transactions involving Bitcoin that arrived from the Website A-related wallet. At 11:39 a.m., Intermediary Wallet A sent 8.65 Bitcoin (valued at approximately $4,018.10) to Antonenko's Bitcoin wallet. That same day, Antonenko forwarded 8.5 Bitcoin to Person 1. Person 1's ledger reflects that later that day, a $3,790 entry appears under the name "Vitalii" and the notation "Citibank" in connection with the purchase of "8.5" Bitcoin. Citibank records, in turn, show a $3,790 cash deposit into a Citibank branch in Granada Hills, California. Person 1's records also indicate that Person 1 later re-sold the Bitcoin that s/he received from Antonenko at an approximately 10 percent profit (*i.e.*, at or above market price).

56.     On July 5, 2014, Person 1 and Antonenko engaged in another series of transactions involving Bitcoin that arrived from the Website A-related wallet. At 6:42 p.m., Intermediary Wallet A sent 4 Bitcoin (valued at approximately $2,669.41) to Antonenko's 1Nkf Wallet. At 7:35 p.m., less than an hour later, Antonenko's Bitcoin wallet forwarded 4 Bitcoin to Person 1's Bitcoin wallet. Person 1's financial ledger reflects a payment to "Vitalii" of "$2,290" via "BofA Transfer" for the sale of "4" Bitcoin.

13

57.     Antonenko's Bank of America records for an account in his name ending in 0170 show an "Online Banking Transfer L [Person 1]" for the same amount, $2,290.

58.     On December 16, 2014, Person 1 and Antonenko engaged in another series of transactions involving Bitcoin that arrived from the Website A-related wallet. At 9:29 p.m., Intermediary Wallet A sent 6.2 Bitcoin (valued at approximately $2,089.79) to Antonenko's 1Nkf Wallet. At the same approximate time, Antonenko forwarded 6.17 Bitcoin to Person 1. Person 1's payment ledger for that day reflects an entry for $1,870 for the purchase of 6.17 Bitcoin under the name "Vitalii" and a notation "BofADeposit."

59.     I have reviewed Bank of America records for the Antonenko account ending in xxxxxxxx0710, which show a deposit in the exact amount reflected in Person 1's ledger — $1,870—at a branch in Santa Monica, California. This causes me to believe that Person 1 made or directed the deposit into Antonenko's Bank of America account, and that Person 1 learned directly or indirectly from Antonenko the account number needed to make the Bank of America deposit.

60.     On December 26, 2014, Person 1 and Antonenko engaged in another series of transactions involving Bitcoin that arrived from the Website A-related wallet. At 3:53 p.m., Intermediary Wallet A sent 6.2 Bitcoin (valued at approximately $2,008.86) to Antonenko's 1Nkf Wallet. At approximately 4:27 p.m., just over half an hour later, Antonenko forwarded 6.17 Bitcoin to Person 1. Person 1's payment ledger for that day reflects a $1,814 payment to "Vitalii" for the purchase of 6.17 Bitcoin and a notation "BofADeposit."

61.     Bank of America records show a deposit in the exact amount reflected in Person 1's ledger —$1,814— into account number xxxxxxxx0170 at a branch in Van Nuys, California. This again causes me to believe that Person 1 made or directed the deposit of Website A-related funds into Antonenko's Bank of America account.

14

62.     In one instance in 2014 identified to date, Antonenko's 1NKf Wallet took money directly from Wallet A, the same wallet that UC paid in June 2015 to purchase PII and payment card data from Website A.  Specifically, on March 17, 2014, the 1NKf Wallet received 25 Bitcoin from Wallet A.  The next day, March 18, 2014, Antonenko's 1GVF Wallet sent 15.17 Bitcoin to Person 1's wallet.

63.     Person 1's ledger shows a March 18, 2014 purchase of 15.67 Bitcoin from "Vitalii" and a resulting deposit of $8,690 into Antonenko's Citibank account.  Antonenko's Citibank records reflect the $8,690 deposit at a branch in Granada Hills, California.[4]

64.     Overall for the calendar year 2014, Person 1's ledger shows that Person 1 paid Antonenko more than $335,000 in cash and bank deposits.  Not all of these amounts originated with wallets associated with the operation of Website A, but as noted above, there is probable cause to believe that the Website A-related amounts are the proceeds of illegal activity, and that Antonenko's use of Person 1 as an unregistered Bitcoin exchange was to conceal the origin of those funds, and to avoid the consequences of cash transactions in these amounts.

65.     Although Person 1's digital ledger stops at the end of 2014, the pattern of payments continued well into 2015—from the Intermediary Wallet A, to Antonenko's Bitcoin wallet, to Person 1's Bitcoin wallet, to an Antonenko bank account through California-based branch deposits in a slightly lower amount—as reflected in the table below.

| DATE | Intermediary Wallet A to Antonenko Wallet | Antonenko Wallet to Person 1 Wallet | California Deposit into Antonenko Bank |
|------|-------------------------------------------|-------------------------------------|---------------------------------------|
| 1/8/15 | 7.17 BTC ($2,073.56) | 7.17 BTC ($2,073.56) | $1,902 |

---

[4]The investigation has yet to reveal why Person 1's ledger shows a purchase from Antonenko of .5 Bitcoin more than Antonenko sent to Person 1's wallet—Antonenko sent 15.17 Bitcoin but is noted as having sold 15.67 Bitcoin.  The transaction is nevertheless significant because it provides probable cause to believe that Antonenko used Person 1's covert services to convert Bitcoin that he received directly from Wallet A to cash.

| 3/9/15 | 3.63 BTC<br>($1,025.66) | 3.7 BTC<br>($1,045.44) | $953 |
|--------|-------------------------|------------------------|------|
| 4/20/15 | 4.88 BTC<br>($1,096.54) | 4.77717 BTC<br>($1,073.43) | $975 |
| 5/5/15 | 4.38 BTC<br>$1,035.83 | 3.717 BTC<br>$879.03 | $795 |
| 5/28/15 | 7.79 BTC<br>($1,858.23) | 7.7717 BTC<br>$1,853.86 | $1,357 |
| 6/8/15 | 10.38 BTC<br>($2,353.87) | 11.17 BTC<br>($2,578.37) | $2,320 |

66.     Antonenko's bank statements also suggest that Person 1 (or a relative acting at her direction) continued to cause cash or direct deposits into the accounts of Antonenko or Person 2 well into 2017.

67.     For example, Antonenko's November 2015 statement for a Wells Fargo account in his name numbered xxxxxxx166 shows "Transfer[s] from [Person 1]" totaling approximately $4,000. Throughout 2016 and as late as March 2017, Antonenko's Wells Fargo account also received approximately $19,700 in transfers from an account in the name of Person 1's sister. Law enforcement personnel familiar with the investigation of Person 1 are aware that Person 1's sister participated in Person 1's unlicensed Bitcoin exchange business at Person 1's direction.

68.     There is also probable cause to believe that Person 1 made cash deposits directly in to Person 2's Bank of America account.

69.     Depicted below, for example, is surveillance video of Person 1 in Bank of America's Sepulveda-Sherman Banking Center making a $7,000 cash deposit into Person 2's bank account on August 13, 2015.

16



70.     On July 26, 2015, Antonenko sent 1.23 Bitcoin (valued at approximately $358.52) to

Person 1's wallet.  Bank of America records for Person 2's account show a deposit the next day of

nearly the same amount—$328—at the same Sepulveda Sherman Banking Center.  Based on the

investigation to date and based on all of the transactions that Person 1 directed into Antonenko's

accounts from the same banking center, there is probable cause to believe that Person 1 made or

directed the July 27, 2015 deposit.

71.     On December 22, 2015, at approximately 10:03 a.m., Person 2's Bank of America

records show a $965 cash deposit made at the same Sepulveda Sherman Banking Center.  Notably,

Wells Fargo records show a $3,000 cash deposit into an account in Antonenko's name that took

place less than 90 minutes later at Wells Fargo's 10225 Balboa Boulevard branch in Northridge,

which is just over 6 miles from the Sepulveda Sherman Banking Center.

72.     Based on the investigation to date and for all of the reasons described above, there is

probable cause to believe that Person 1 made or directed both December 22, 2015 deposits, and that

17

the deposits were split across 2 different financial institutions and two account holders to conceal and disguise the nature of the Bitcoin-for-cash transactions.

### Conclusion

73.     For all of the reasons stated above, probable cause exists to believe that Vitalii Antonenko conspired with Person 1, Person 2, and others to violate 18 U.S.C. § 1956(a)(1)(B) in violation of 18 U.S.C. § 1956(h).

I swear to the foregoing under penalties of perjury.

Peter Gannon
Senior Special Agent
United States Secret Service


Sworn and subscribed to m  thi  26th   , of February 2019

HONORABLE DAVID H. [illegible]
UNITED STATES MAGISTRATE JUDGE